**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| **Bessemer & Lake Erie Railroad Company, et al.,** | ) ) | **CASE NO.  1:06 CV 2392** |
| **Plaintiffs** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Seaway Marine Transport, et al.**, | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendants.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon plaintiffs' Motion for Partial Summary Judgment as to Liability (Doc. 38) and defendants' Motion for Partial Summary Judgment as to Damages (Doc. 34).  This is an admiralty action involving an allision[1] between defendants' vessel and plaintiffs' ship loader.  For the following reasons, both motions are GRANTED.

<u>**Facts**</u>

Plaintiffs Bessemer & Lake Erie Railroad Company and The Pittsburgh and Conneaut

---

[1]  An allision occurs when a moving vessel strikes a stationary object such as a dock.  A collision occurs when a moving vessel strikes another moving vessel. *Fisher v. S/Y Neraida*, 508 F.3d 586 (11th Cir. 2007).

1

Dock Company (hereafter, P&C) filed their First Amended Complaint in Admiralty against defendants, Seaway Marine Transport, Algoma Central Corporation, Upper Lakes Shipping Ltd., Upper Lakes Shipping, Inc., Upper Lakes Group, Inc. a/k/a Jack Leitch Upper Lakes Shipping *in personam*, (hereinafter collectively referred to as "Seaway") and Motor Vessel Canadian Enterprise *in rem* (hereafter, the Enterprise).

The parties submit the following facts, supported by evidence affixed to the briefs. Defendants[2] own and operate the Enterprise (otherwise referred to as the vessel or ship), a Great Lakes self-unloader (i.e., it is capable of unloading material using its own equipment) that carries bulk cargo.  The Enterprise is 730 feet long and has a beam of 75 feet. The Enterprise is equipped with a 250 foot self-unloading boom which is a large crane-like device affixed to the Enterprise's deck. It was the unloading boom that made contact with and damaged plaintiffs' ship loader.  While underway, the boom is secured in the middle of the hatches in a device known as a saddle. The boom moves in a 180 arc from port (left side) to starboard (right side) with its apex at the stern (rear end of the vessel), and is controlled by the Wheelsman from two separate control panels located in close proximity to the stern winches on both the starboard and port sides. On the Enterprise, the loading process is overseen by the First Mate.

At the time of the incident, Frederick Penney served as the Enterprise's Captain/Master, Jim Donnelly served as its Wheelsman, and Louis Drolet served as its First Mate. Jerald Fertig was on duty as P & C's ship loader operator at the time of the incident.

---

[2]     Defendants state that defendant Algoma Central Corporation does not own and operate the Enterprise and it should be dismissed from this action.

2

On October 4, 2005, shortly after 4:00 a.m., the Enterprise was moored (secured) at the P&C dock, whose operations include loading and unloading coal.  At the time of the incident giving rise to the action herein, the Enterprise had entered the docks to be loaded with coal.

The P&C docks include four loading docks.  The #3 dock, where the incident occurred, is used primarily for coal.  Generally, when a vessel is loading coal at the docks, the material is hauled up to the ship loaders located at the #3 dock through a series of conveyer belts.  The ship loaders then lower the coal into the ship's hatches using a chute.  P&C has two ship loaders that load coal at the #3 dock.  The north rig, referred to as ship loader No. 1, is the rig that was damaged in the incident.  Ship loader No. 2 is at the south end of the #3 dock.  Each ship loader has an operator who sits in a chair in a cabin.

Ship loader No. 1 consists of the following components: boom; chute/nozzle; trim; mule house; and cab.   The ship loader boom moves vertically, and when not in operation to load a moored vessel, it is in a vertical position. When in use, the boom is lowered to a horizontal position over the deck of the ship to load coal through its chute into the ship's hatches.  The ship loader's boom is never extended until the vessel is fully docked and readied by the crew to receive the cargo. When the ship loader operator receives permission to begin the loading process, the boom is lowered and remains stationary during the loading process. The boom is lowered by operating controls located in the mule house. In order to lower the boom, the ship loader operator enters the mule house, which is located a good distance behind the ship loader itself, via a stairway.  Once the boom is lowered to an angle, the ship loader operator walks out onto the boom to enter the operator's cab or cabin.  After

3

the loading process is completed, the ship loader operator walks back out along the boom into the mule house to raise the boom. Once the boom is raised the ship can exit the dock.  Ship loader No. 2 operates in a different manner.

The ship loader operator runs the ship loader from the cabin while sitting facing north with windows in front of him. The ship loader operator's controls are located in front of him at waist level and at arm level when seated.  Ship loader operator Jerald Fertig had worked the No. 1 and No. 2 ship loaders off the #3 dock for approximately 5 years.

In general, after Captain Penney secures the vessel at the dock, the Captain turns control of the vessel over to the First Mate who begins loading procedures. The First Mate prepares the written loading plan and coordinates the loading plan with the ship loader operator by providing a copy to him.   The original loading plan for this trip called for the use of both ship loaders.  Not long prior to the ship's arrival at the dock, it was learned that the coal would be loaded using only ship loader No. 1.  During the loading process, the First Mate was in radio contact with the ship loader operator, who was sitting in the cabin.

According to the loading plan, the first hatch to be loaded was the No. 3, followed by the No. 5 and then the No. 14.  Following the loading of the No. 5, it was necessary to shift the vessel forward (north) about 200 feet to align the chute of the ship loader for loading into hatch No. 14 which is closer to the center of the ship.  In order for the ship loader chute to gain access to the No. 14 hatch, the Enterprise crew had to move its self-unloader boom up and out of the way so that the boom would not block the hatch.   The Wheelsman is responsible for operating the boom, under the First Mate's orders.  First Mate Drolet ordered Wheelsman Donnelly to bring the ship's boom out "to the ship's side," away from the dock.

4

The Wheelsman moved the boom to its up position over the port side of the vessel.  After ordering the ship's boom swung out to the ship's side, Drolet, the First Mate, via radio asked Fertig, the ship loader operator, for permission to move or shift the vessel and was granted such.  Shifting of the ship is accomplished by the crew by use of electrical winches to pull the ship along the dock.

As the shift began, First Mate Drolet was at the forward end (bow) of the ship, operating winch controls.  Wheelsman Donnelly was at the stern (rear) of the ship.  The First Mate could not see the ship's self-unloading boom from his position.  The ship loader operator was in the cabin suspended over the deck of the ship.  The operator was facing north toward the bow of the vessel.  The operator had a window facing south (behind him) toward the stern of the vessel, but he was watching the vessel shift below him and was not looking at the boom.  The vessel shifted slowly, with the ship loader operator transmitting the distances over the radio to the First Mate, that is, the number of feet the vessel had to move before the chute reached hatch No. 14 (e.g., 96 feet to go, 72 feet to go, 48 feet to go...)

The Wheelsman acknowledged that at the time of the allision, he was not looking at the ship loader but concentrating on the electrical winches and the movement of the vessel with the vessel's deckhand positioned on the dock below. The ship loader operator prepared for the Enterprise to shift by raising the boom and chute on his ship loader so that it would be high enough to clear the hatch crane on the deck.  The ship loader operator was watching the vessel  move beneath him with his back to the approaching vessel's boom. Approximately three to five minutes into the shifting with about 45 feet to go, the Enterprise's boom collided with the southwest end of the ship loader at the end of the walkway. The ship loader operator

5

felt and heard the vessel's boom hitting the No. 1 loader and yelled for the First Mate to stop.

The First Mate heard the ship loader operator stating "48 feet to go," and then heard the ship

loader operator yell, "stop, stop, stop." At that point, the First Mate heard the allision

although he could not see it. He immediately relayed to his crew via the radio the order to

stop the vessel which was able to stop quickly because the shifting of the vessel had begun to

slow with only 48 feet to go until reaching No. 14 hatch. The Wheelsman did not hear or see

the boom strike the ship loader, but recalls the First Mate yelling, "stop, stop, stop."

Plaintiffs thereafter filed their First Amended Complaint in Admiralty which alleges

that defendants were negligent in connection with the allision which damaged the No. 1 ship

loader.

This matter is now before the Court upon plaintiffs' Motion for Partial Summary

Judgment as to Liability and defendants' Motion for Partial Summary Judgment as to

Damages.

**<u>Standard of Review</u>**

Summary Judgment is appropriate when no genuine issues of material fact exist and

the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*,

8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates
> the absence of a genuine issue of material fact.

6

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its

resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242,

248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported
> as provided in this rule, an adverse party may not rest upon the
> mere allegations or denials of [his] pleadings, but [his
> response], by affidavits or as otherwise provided in this rule,
> must set forth specific facts showing that there is genuine issue
> for trial.  If he does not respond, summary judgment, if
> appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most

favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th

Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562

(6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must

"produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53

F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence

of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57

F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the

evidence is "merely colorable" and not "significantly probative," the court may decide the

legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Plaintiffs' Motion for Partial Summary Judgment as to Liability**

Plaintiffs argue that they are entitled to summary judgment as a matter of law as to liability based on the application of the Oregon Rule, a rebuttable presumption of liability which holds that when a moving vessel collides with a stationary object, the moving vessel is presumed to be at fault.  Defendants argue that the Oregon Rule does not apply because the ship loader was not a stationary object, and plaintiffs' negligence was a proximate cause of the damage at issue. For the following reasons, the Court agrees with plaintiffs that they are entitled to summary judgment as to liability.

Under the general maritime law, the elements of negligence are generally the same as a common law negligence action, i.e. duty, breach, causation and damages. *See Pearce v. United States*, 261 F.3d 643, 647-48 (6th Cir.2001).

The Oregon Rule "creates a rebuttable presumption of fault against a moving vessel that, under its own power, allides with a stationary object" *In re Superior Construction Company, Inc. v. Brock,* 445 F.3d 1334 (11th Cir. 2006) (citing *The Oregon*, 158 U.S. 186 (1895) ). This rule "is premised on the commonsense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled is some way." *City of Chicago v. M/V Morgan,* 375 F.3d 563 (7th Cir. 2004) (citations omitted) "Once fault is presumed the defendant may come forward with evidence to rebut the presumption." *Id.* at 573.  The presumption "may be rebutted by showing, by a preponderance of the evidence, either that the allision was the fault of the stationary object, that the moving vessel acted with

8

reasonable care, or that the allision was an unavoidable accident." *In re Superior Construction Company*, 445 F.3d at 1339-1340.    "Each independent argument, if sustained, is sufficient to defeat liability." *Fisher,* 508 F.3d at 593.

Defendants argue that the Oregon presumption does not apply because the ship loader was not a stationary object.  This Court disagrees.

Defendants rely on *Consolidated Rail Corporation v. M/V Lagada Beach,* 1983 American Maritime Cases 1242 (E.D.Pa. Nov. 22, 1982), which determined that the presumption that a vessel which strikes a stationary object is deemed to be negligent does not apply to a movable object over navigable water- in that case a movable coal-loader's operating cab.  There, the docking pilot was found to be negligent for allowing the ship loader's operator's cab to extend when in a stowed position 9.45 feet over the side of the pier when not engaged in use for loading.  The vessel allided with the ship loader while being maneuvered to the dock.  So too, defendants assert, the ship loader is not a stationary object where it moved 90 degrees from the upright vertical position to a horizontal position, stretching 75 feet across the deck of the vessel.  And, defendants contend, the ship loader could have moved vertically, rather quickly, a distance of 10 to 15 feet to avoid contact with the boom.  *Consolidated Rail Corporation* is inapposite because, unlike in that case, when the incident herein occurred, the Enterprise was not maneuvering to the dock but was moored at the dock and engaged in the loading process. The extension of the ship loader's chute over the vessel's deck was a necessary part of the loading process.  While the ship loader's boom moves before or after loading to allow ships to enter and exit the dock, it is lowered to a horizontal position after the vessel is moored and remains there to effect loading.

9

In fact, the structure of the ship loader belies defendants' argument that it is a moveable object.  Plaintiffs' description of the ship loader is consistent with the photographs submitted and is not disputed by defendants:

> The ship loader is made up of several parts; a superstructure of steel beams within which a complex series of conveyor belts runs. The purpose of the conveyor system is to carry coal from plaintiffs' land-based silos to the ship loader's chute. The chute itself connects to the ship loader's boom and can be lowered into cargo vessels moored at the docks below. The operator of the ship loader sits in a cab affixed to the boom of the ship loader. The boom and the connected cab can be raised vertically and horizontally. The boom is raised to allow vessels into and out of the docks, and is lowered horizontally over a vessel's deck when actively involved in the loading process. The boom remains in the raised position when stowed. While actively engaged in loading the ship loader's boom remains at all times in a constant horizontal position with the chute hanging down over the vessel's hatches.

(Doc. 44 at 5-6; Ex. C)

While the boom is moveable, it does not move during loading- only before or after. The boom is lowered to a horizontal position after a vessel is moored to the docks in order to accomplish the loading process, and is raised to a vertical position after completing the loading process in order to allow the vessel to exit the docks.

Because the Court finds that the ship loader is a stationary object, the Court finds that the Oregon Rule applies.  The Court next determines whether defendants are able to rebut the presumption by showing either that the allision was the fault of the ship loader, that the Enterprise acted with reasonable care, or that the allision was an unavoidable accident. Having argued that the Oregon Rule does not apply, defendants do not then show that they are able to rebut the presumption.  Having failed to do so by a preponderance of the evidence, therefore, defendants fail to rebut the presumption.  Plaintiffs additionally demonstrate that defendants cannot overcome the presumption.

10

First, plaintiffs assert that defendants failed to act with reasonable care.  Plaintiffs point to the deposition testimony of the Enterprise's Captain, First Mate, and Wheelsman who admit that it is their responsibility to avoid contact with stationary objects, and that their vessel should not have struck the ship loader with the Enterprise's self-unloading boom.

Plaintiff points to the Captain's deposition wherein he testified:

Q: Okay. Captain, you would agree, wouldn't you, that it's always the officer on deck and the crew's responsibility to avoid striking any fixed object while shifting a vessel?

[Attorney objected on basis that a legal conclusion was asked for.]

Q.  That's fine.  Just in operation, that's common sense, isn't it?

A: Yes, common sense.

(Penney depo. at 121).

The First Mate also testified:

Q: All right. Okay, and in moving the vessel, even in shifting it, you're responsible to try to avoid any obstructions. Is that correct?

A: Correct.

(Drolet depo. 40)

And,

Q: Okay. And [the boom] could have avoided the North Rig if it had been swung out further than it was?

A: Yeah.

(*Id.* 30).

In this regard, plaintiffs point to Seaway's Safety Management Manual Cargo Procedures which state, "The Mate or other designated person operating the boom must be aware of any

11

shore obstructions, including shore loading equipment; and take necessary steps to ensure

adequate clearance with any fixed or moving equipment."  (Doc. 38 Ex. N) Additionally, the

Manual of Standard Procedures states, "The First Mate has overall responsibility for securing

and any movement of the unloading boom" (*Id.* Ex. J).

Finally, the Wheelsman testified:

Q: Okay. Because you [sic] always trying to avoid hitting any obstructions. . .

A: That's right.

Q: ... on the dock, right?

A: That's right.

Q: I mean, that's kind of common sense when you're shifting the boat, right?

A: Yes.

(Donnelly depo. 51-52).  And,

Q: Okay. And, again, you're instructed. You're not making that determination?

A: I don't make no decision, no.

Q: All right. If the mate's vision was obstructed by a ship loader, how can he tell how far out?

A: If his vision was obstructed, he would probably say, "I can't see. Just hang on a second," and I would just stop the boom right there.

Q Okay. And what. . .

A: And then he would probably go to where he could see and say, "Okay, go ahead, put it out now."

Q: Okay. And that would be a prudent thing to do, wouldn't it?

A: Sure it would.

(*Id.* 63).  And,

12

Q: Okay. And so nobody basically made that determination that it was out far enough.

A: No.

(*Id.* 70).

Where no one onboard the vessel made sure that the boom was up and out of the way of the ship loader, defendants cannot show by a preponderance of the evidence that the Enterprise acted with reasonable care.[3]

Second, plaintiffs assert that defendants fail to show that the allision was the fault of the stationary object. In its brief, defendants state that the ship loader operator, Fertig, was the only person with an unobstructed view of the ship's boom in relation to the ship loader, and

---

[3]     Both parties note that defendants' Safety Management Manual Cargo Procedures were revised after the accident on October 21, 2005 to state:

**Add the following new Chapter based on Oct. 04/05 incident at Conneaut**.

When loading operations are conducted within close proximity to the self-unloading boom, effective communications between the ship and shore is critical. It may involve the ship's personnel spotting the movements of a loading rig when it is operating in or located in close proximity to the ship's self-unloading boom. The Officer on Watch or delegated person operating the self unloading boom must be aware of any shore obstructions including the shore loading equipment, and take the necessary steps to ensure adequate clearance with any fixed or moving equipment during shifting operations. Authorized operators of the self unloading boom must always be alert to any possible obstructions when slewing an unloading boom and every step must be taken to maintain adequate clearances.

...

The Officer on Watch must ensure that adequate personnel are available for shifting, including spotting when required.

(Doc. 38 Ex. N).

13

that he had ample time to turn his head to look out the south window of the cab to check on the position of the ship's boom.  Plaintiffs dispute the statement that the ship loader operator should have moved the ship loader up and out of the way of the self-unloading boom on the basis that he was in the best position to see the approaching boom.  As discussed above, the ship loader operator was facing north, away from the vessel's boom.  Plaintiffs assert that the ship loader cab's windows face north and allow the operator to look down at the chute and hatches below, and that the ship loader operator was required to continuously look down to the deck below since, by virtue of the Eneterprise's failing to provide its own spotter, he was required to spot distances for the vessel.

Plaintiffs point to the testimony of the ship loader operator:

Q.  So tell me what happened.  Once the vessel started shifting, what's your role? What are you doing?

A: I was spotting the boat for the Hatch 14.

Q: Okay. What's that mean?

A: Just letting them know where he's at and how close – where I needed him to be for the loading of the hatch. I'm counting down feet-wise.

Q: So you're telling him how far Hatch 14 is from being below the loader?

A: Correct.

Q: How many more feet until hatch 14?

A: Correct.

Q: And you're doing that by looking – you're sitting in the seat of the cab and you're looking through that slanted glass to the ship below?

A: Yes.

(Fertig depo. 55).  Plaintiffs further point out that the ship loader operator's back was to the

14

ship's boom as his chair was affixed to the floor of the loader and the windows faced north:

> Q: Okay. And the seat that's inside that cab, is it one that swivels or is it in a fixed position facing north?
>
> A: It will swivel to the west and east a little bit, but not –
>
> Q: Not to the south?
>
> A: No.

(*Id.* 72). And,

> Q: All right. So you were looking north. When you're sitting in your cab, you're looking north through the wall – the glass window, basically, right?
>
> A: Right.

(*Id.* 52-53).

As stated above, the Enterprise's self-unloading boom was to the south of the ship loader at the time it struck the ship loader, and the self-unloading boom struck the southwest corner of the ship loader.

There is no evidence that the allision was the sole fault of the ship loader.  *See City of Chicago, supra* (To rebut the presumption, defendants must show that the allision was the sole fault of the stationary object.)

Finally, defendants fail to demonstrate that the allision was an unavoidable accident. *See City of Chicago, supra* ("The 'inevitable accident' doctrine applies when the cause of the collision was a cause not produced by the vessel, but a cause of which the vessel could not avoid.") There is no evidence that the allision was a result of a cause of which the Enterprise could not avoid.  Additionally, plaintiffs contend that the allision was not inevitable given that the crew of the Enterprise testified that they had successfully docked and loaded the vessel,

15

and other vessels, at the P & C docks. And, the Wheelsman admitted that neither he nor the First Mate made the determination that the boom was out far enough. (Donnelly depo. 70).

For these reasons, defendants fail to rebut the presumption of liability of the Oregon Rule and summary judgment on liability is warranted.

Citing *City of Chicago,* defendants assert that even were the presumption applicable, it does not preclude a finding of comparative fault on the part of the stationary object. This is true, however, defendants must first rebut the presumption:

> Rebutting the presumption does not necessarily exonerate the vessel from all liability. Under the principles of pure comparative fault, both parties may be found to have contributed to the accident. When two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault. Therefore, under the comparative fault analysis between a vessel and a stationary object, a vessel may minimize its liability by providing evidence that the stationary object contributed to the injury it incurred, however, it will be absolved of liability only if the stationary object is deemed the sole proximate cause of the injury.

*City of Chicago,* 375 F.3d at 573.

Even assuming the Court considered plaintiffs' comparative fault, the Court disagrees with defendants' assertion that plaintiffs' negligence substantially contributed to the accident.

Defendants argue that plaintiffs were negligent in allowing the ship loader to become an obstruction to navigation and in failing to use reasonable care where the ship loader operator took on an active role in managing the vessel while it shifted. In so doing, defendants assert that plaintiffs breached their duty of reasonable care as a wharfinger (person or entity operating a wharf, dock, etc.) towards the vessel:

> Although a wharfinger does not guarantee the safety of vessels coming to his wharves,

16

he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and if there is any dangerous obstruction to remove it, or to give due notice of its existence to vessels about to use the berths.

*Grace Line, Inc. v. Todd Shipyards Corp*., 500 F.2d 361, 365 (9th Cir.1974), quoting *Smith v. Burnett*, 173 U.S. 430, 433 (1899).

Once again, defendants rely on *Consolidated Rail Corporation, supra,* to assert that like the operator's cab extending 9 feet beyond the edge of the pier and encroaching on the waterway, the ship loader herein also constituted an obstruction to navigation by extending over the Enterprise's deck in such a manner so as to allow it to come into contact with the boom.  As discussed above, however, while allowing a ship loader boom when not in use to extend over the waterway and interfere with incoming vessels may constitute negligence, the extension of the ship loader chute over the Enterprise's deck herein was a necessary, and anticipated, part of the loading process.  Similarly, defendants' reliance on *City of Portland v. Luckenback Steamship Co.*, 217 F.2d 894 (9th Cir. 1954) and *F.S. Royster Guano Co. v. Outten,* 266 F. 484 (4th Cir. 1920) is unconvincing.  In those cases, cranes were left inappropriately extended, while not in use, jutting out over navigable waters which resulted in ships striking the objects as they moved through the waterways.  Such was not the case herein where the Enterprise was secured at the dock and being loaded with coal.  While the ship loader's boom is stowed in an upright position as ships enter or exit the docks, the boom is necessarily in a down position and over the deck of the vessel while loading is occurring.

Defendants further contend that plaintiffs have failed to provide relevant documentation showing that the Army Corp of Engineers has issued a permit for the ship loader.  Plaintiffs, however, have submitted the documentation.  (Doc. 44 Ex. B)

17

Penultimately, defendants contend that because plaintiffs were actively involved in the vessel's movement, there are at least issues of fact as to their negligence.  Defendants point out that the ship loader operator communicated via radio with the First Mate and provided him with permission to shift the vessel.  The operator then acted as a spotter for the movement of the vessel, communicating to the First Mate the position of the ship loader's chute in relation to the hatch by calling out the number of feet the vessel had to move before the chute reached hatch No. 14.  Defendants assert that the operator had time to turn his head and look out the south window of the cab to check the position of the ship's boom.  Defendants point to the First Mate's deposition testimony that the crew and the ship loader operator worked as a team in shifting the vessel.

Plaintiffs, however, point to the Captain's and First Mate's testimony that they had the responsibility for the vessel's movement while moored at the dock.  This Court finds defendants' assertion that the operator's assistance establishes contributory negligence to be nonavailing.  As discussed above, the deposition testimony of the Enterprise's Captain, First Mate and Wheelsman concede that it is their responsibility to avoid contact with stationary objects and that they are solely responsible for the shifting of the vessel.  A similar conclusion was reached in *Kure Shipping S.A. v. Louisiana Pacific Corp.,* 2001 WL 34037327 (N.D.Cal. Aug. 27, 2001), wherein the court recognized that despite the dock's captain's offer of assistance, the captain of the ship and not the owner of the dock was "in charge of the operation and navigation of the vessel at all times..."  and, thus, was responsible for the shifting of the vessel that was moored at the dock for loading.

Finally, defendants contend that plaintiffs violated their own operating procedures by

18

failing to move the ship loader to a position that was clear of all vessel structures, including the ship's boom, prior to beginning the shift.  Defendants point to the following internal rule:

> Ship loader operators are required to raise the boom and/or slew their machine into the clear each time a vessel shifts to a compartment that is immediately adjacent to or in close proximity to any vessel structure which would come in contact with the ship loader chute, boom, cab, and/or etc.

(Doc. 42 Ex. 5, Book of Rules and Instructions Governing All Employees) Defendants cite to deposition testimony of plaintiffs' upper management (the dock foreman, manager of operations and zone superintendent) who agree that the literal interpretation of this rule means that the ship load operator must check to ensure that the ship loader is clear of all vessel structures, including the ship's boom, prior to commencing the shift.

Plaintiffs assert that defendants stretch the meaning of the rule, and that in questioning their ship loader operator, defense counsel ignored the language "immediately adjacent to or in close proximity to any vessel structure," thereby attempting to show that the ship loader operator was duty bound to be "clear of any vessel structure that *might* come into contact." Plaintiffs point to Operator Fertig's testimony:

> Q: Okay. Under the rule that we just referenced, is that your obligation to make sure that your ship loader is clear of any vessel structure that might come into contact with the ship loader chute, boom, cab, etc.?
>
> [Objection asserted]
>
> A: I was clear of what I had to be, what I was responsible for. And from my view, that far away, I cannot tell what angle the boom's at or where it's headed the ship's boom.
>
> Q.  You would agree that Rule Number 1, as written, requires you to make sure that your ship loader is clear of any structure from the vessel that may come into contact with your loader, right?  Isn't that your responsibility?
>
> [Objection asserted]

19

A.  Rephrase the question.

Q: Yeah. Doesn't this rule require you to make sure that your ship loader is not going to come into contact with any structure of the vessel during a shift?

A: To come into contact with any part of it? Then I'd have to put the ship loader all the way up in the upright position every shift.

Q: Why?

A: Because the pilothouse sticks up even further than the boom.

Q: Well, you weren't going to shift back as far as the pilothouse, were you?

A: Yeah; but you're assuming that—

Q: I'm sorry?

A: You're assuming that I could come into contact with any part of the ship; would be take it all the way up to that position, so.

Q: Let me just read the rule: "Ship loader operators are required to raise the boom and/or slew their machine into the clear each time a vessel shifts" -- okay, are we clear so far –

A: Correct; I did that.

Q: -- "to a compartment that is immediately adjacent to or in close proximity to any vessel structure which would come in contact with the ship loader chute, boom, cab."
So if you're shifting the vessel and the pilothouse is not going to be anywhere near, you're not shifting it so far that the pilot house would be anywhere near your ship loader, then you don't need to worry about it under this rule, correct? Because it's not in close proximity.

A: And under this shift I'm responsible to be above the ship or hatch crane, and I'm not responsible for –

* * *

(Fertig depo. 62-65).  And,

Q.  Is the boom part of the vessel?

20

A.  Yeah.

Q: Okay. And it says you've got to make sure that you're clear of any vessel structure that would come into contact with the ship loader chute, boom, cab. If the boom is part of the vessel structure, your responsibility under this rule is to make sure that you're clear of it, isn't it?

A: I'm responsible for the ship loader and I was clear of it from where I was at.

Q: You weren't clear of the ship's boom, though?

A: Well, obviously not in the end, but that's not my responsibility. That's the boat's responsibility.

(*Id.* 65)

Plaintiffs assert that the ship loader operator's testimony shows that he was mindful of and in compliance with the rule. Plaintiffs contend that his testimony in response to defense counsel's unfair questioning shows that he does raise his boom so as to avoid those ship structures immediately adjacent to or in close proximity of the compartments being loaded. With regard to this incident, plaintiffs assert, the ship loader operator was not required to move his ship loader to avoid the Enterprise's self-unloading boom since the Enterprise's self-unloading boom was not immediately adjacent to or in close proximity to either Hatch No. 5 (the hatch the vessel was shifting from) or Hatch No. 14 (the hatch the vessel was shifting to). The Court agrees that plaintiffs' negligence is not established on the basis of this internal rule.

In addition to failing to rebut the presumption of liability, defendants fail to show that plaintiffs were negligent.[4]  For these reasons, plaintiffs' Motion for Partial Summary

---

[4]        As stated above, the original loading plan, calling for use of both ship loaders, was changed not long before arrival at the dock so that only ship loader No. 1 would be used.  Defendants state in the factual section of their brief that had the

21

Judgment as to Liability is granted.

### (2) Defendants' Motion for Partial Summary Judgment as to Damages

As a result of the October 4, 2005 allision damaging plaintiffs' ship loader, the coal dock was out of operation until the ship loader was repaired seven weeks later on November 21, 2005.  Plaintiffs have made a damage claim for lost profits[5] related to the shutdown of dock #3 consisting of 1) profits lost as a result of train diversions of 500 million pounds of coal which was sent to other docks and carried by other railroads and 2) profits lost as a result of the failure of one of plaintiffs' major customers, Stelco, Inc., to renew its contract with plaintiffs in 2006.

Defendants assert that they are entitled to summary judgment on the claim for lost profits because 1) plaintiffs have failed to comply with Fed.R.Civ.P. 26(a)(1)(C) requiring that they provide a computation of damages and produce documents on which such computations are based and 2) the claim for revenue lost for the entirety of 2006 as a consequence of the alleged non-renewal of the Stelco contract was not a reasonably

---

loading into hatch No. 14 been accomplished through the other ship loader, the vessel would not have had to shift as a great a distance and the ship's boom would never have hit the ship loader.  Defendants point to the Wheelsman's testimony that he put the boom out to the ship's side as he would always do when both ship loaders were being used.  The boom was not put far enough out for purposes of ship loader No. 1.  The Wheelsman acknowledged that it should have been out another 10 to 15 feet.  He further testified, "However, the boom was out where it usually is with two rigs [ship loaders].  Normally it would have been out far enough.  However, it was not, as we were only using the North Rig.  Neither myself or the first officer or the rig operator realized this fact."  (Donnelly depo. 85)  Defendants, however, do not demonstrate that the change in the loading plan was plaintiffs' fault or due to plaintiffs' negligence.

[5]     Defendants do not seek summary judgment as to plaintiffs' claim for physical damage to the ship loader.

22

foreseeable consequence of the incident and is, thus, not recoverable.

Plaintiffs assert that defendants' motion is actually an untimely discovery motion which is, nonetheless, improper as plaintiffs have fully complied with discovery. Additionally, plaintiffs contend that the lost profits claims were the reasonably foreseeable result of the shutdown of the dock. For the following reasons, the Court agrees with defendants.

On March 10, 2006, prior to the commencement of this lawsuit, plaintiffs' Risk Mitigation Officer sent a letter to defendants informing them that plaintiffs had a loss of business of $1,405,776.00 as a result of the October 4, 2005 incident. No details were provided as to how the loss of business figure was determined. In a letter to plaintiffs' counsel after commencement of the lawsuit, defendants stated,"Regarding the Rule 26 Disclosures ... we are especially looking forward to receipt of all documents relating to the issue of damages." Defendants assert that despite being informed that defendants were especially interested in the issue of damages considering the $1.4 million figure, plaintiffs' Rule 26 disclosures offered nearly nothing in the way of calculation of damages for lost revenue, and subsequent supporting documentation contained only two pages directly related to such.[6] There was nothing, defendants contend, in plaintiffs' initial disclosures that addressed the issue of lost profits, i.e., the net amount of lost revenue that was being claimed as lost profits. After receipt of the Rule 26 disclosures, two letters were sent by defendants to

---

[6]     Rule 26(a)(1)(A)(iii) states that "a party must... provide... a computation of each category of damages claimed by the disclosing party- who must also make available for inspection and copying... documents... on which each computation is based..." Rule 26(a)(1)(C) is the predecessor to the rule.

plaintiffs requesting that plaintiffs produce documents supporting the claim for $1,405,776.00 in lost revenue and the method of calculating such.  Defendants state that plaintiffs never supplemented their Rule 26 disclosures to state the amount being claimed as lost profits, how such an amount had been computed and what documents supported the computation.

Very shortly after receipt of plaintiffs' Rule 26 disclosures, defendants served on plaintiffs their first request for production of documents which asked for, among other things, documents supporting the $1,405,776.00 lost business or revenue claim. Several weeks later, defendants served on plaintiffs a second request for production of documents requesting documents relating to overhead savings by plaintiffs during the time that operations were interrupted at the dock as a result of the incident and costs savings resulting from plaintiffs not having to transport, handle and load 500 million pounds of coal.[7]  When plaintiffs did not respond to these requests, defendants filed a Motion to Compel which was then granted by this Court as unopposed.  Plaintiffs did subsequently provide answers to the discovery requests, but defendants assert that plaintiffs have still failed to produce documentation addressing how it intends to calculate and prove its claim for lost profits.

Defendants next presented their second set of interrogatories to plaintiffs which contained an interrogatory requesting a calculation of damages.  Plaintiffs responded, "See documents already in defendants' possession.  See, also the depositions of J. Streett and J. Rogers taken on May 31, 2007."  Several letters were then sent by defendants to plaintiffs

---

[7]      As discussed below, defendants' economic expert avers, "[L]ost profits are properly determined by estimating the gross revenue that would have been earned but for the wrongful act reduced by avoided costs."  Thus, "avoided costs" would be synonymous to "cost savings."  Plaintiffs do not offer an economic expert.

24

requesting additional documentation as to costs saved as a consequence of not having had to handle 500 million pounds of coal and what the actual amount of net lost profits may be.

Defendants state that having failed to obtain the information through the foregoing methods, they attempted to get the information through the deposition of plaintiffs' corporate representatives.   The deposition notices to Bessemer stated that the witness should be prepared to testify, "In reference to each item of claimed lost revenue... an estimate and breakdown as to the actual costs that would have been incurred in transporting and handling the cargo..." and "In reference to [cancelled shipments], a breakdown of the actual costs incurred." The witness was also asked to produce documents supporting plaintiffs' loss of revenue claim, including savings realized as a result of the cancellation of the shipments.  The deposition notices to P&C stated that the witness should be prepared to testify, "In reference to each item of claimed lost revenue... an estimate and breakdown as to the actual cost that would have been incurred in storing, handling and loading the cargo..." and "In reference to [cancelled shipments], a breakdown of the actual costs incurred."  Again, the witness was asked to produce documents supporting plaintiffs' loss of revenue claim, including savings realized as a result of the cancellation of the shipments.

Michael Suter was designated as the corporate representative for both plaintiffs. His deposition, defendants assert, provided almost none of the requested information.  Further, when asked whether he had located specific documents as to costs saved as a result of not hauling 500 million pounds of coal, Suter responded, "I don't know what those documents would be."  And he conceded elsewhere that he did not know whether or not plaintiffs saved costs or incurred costs by not handling certain cargo.  (Doc. 34 at 9)

25

Finally, defendants present the affidavit of their economics expert, Robert Walworth, who avers,

> 6. ... [L]ost profits are properly determined by estimating the gross revenue that would have been earned but for the wrongful act reduced by avoided costs.
>
> 7.  The plaintiffs' claim represents only an estimation of gross revenue lost ...
>
> 8.  The plaintiffs' claim is not reduced by any avoided costs, despite the fact that the plaintiffs acknowledged that employees were laid off during the period that the ship loader was out of operation, and that nearly a half-billion pounds of coal were not transported.
>
> 9.  The defendants have requested a variety of financial records to address the issue of avoided costs.  The plaintiffs have not responded to these requests in any meaningful way.
>
> 11.  At his July 25 deposition, Michael Suter was asked a variety of questions regarding avoided costs.  Mr. Suter acknowledged that he had not done any specific analysis to determine whether costs were avoided related to the claimed revenue losses.
>
> 14. As of this time, the plaintiffs have provided insufficient data with which to provide a proper determination of either avoided costs or operating ratio and, as such, the undersigned cannot calculate or express an opinion as to the reasonable assessment of damages sustained by plaintiffs as 'lost profits' except that which is set forth in my ... report.

(Doc. 33 Ex. 24)

Based on the foregoing, defendants assert, plaintiffs have failed to provide any meaningful evidence establishing the amount of "costs saved" as a result of not having transported, handled and loaded 500 million pounds of coal and, as a result, cannot identify what portion of the gross revenue allegedly lost as a result of those diversions would have actually been realized as "profits."

Defendants assert that notwithstanding the mandate of Rule 26, plaintiffs have failed to provide a computation of their claim for lost profits and supporting documentation.

26

Defendants direct the Court's attention to Fed.R.Civ.P. 37(c)(1) (in effect in 2007) which

states,

> A party that without substantial justification fails to disclose information required by
> Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule
> 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial,
> at a hearing, or on a motion any witness or information not so disclosed.

Defendants contend that since plaintiffs' failure to satisfy the Rule 26 and subsequent

discovery requests to support the lost profits claim was neither justified nor harmless, the

claim for damages must be dismissed.

Plaintiffs argue that defendants' motion is really a request for dismissal as sanctions

for failure to comply with discovery pursuant to Rule 37 although the time for filing

discovery motions has expired.[8]  This Court disagrees. Plaintiffs cite to law requiring a

showing of bad faith or willfulness before a court may impose the sanction of dismissal under

Rule 37(b)(2) for failure to comply with a court order.  *See Phillips v. Cohen,* 400 F.3d 388

(6th Cir. 2005).  Defendants, however, seek summary judgment on the issue of lost profits

because evidence of such damages is inadmissible under Rule 37(c)(1).  It has been

recognized that "[t]he exclusion of non-disclosed evidence is automatic and mandatory under

Rule 37(c)(1) unless non-disclosure was justified or harmless."  *Multimatic, Inc. v. Faurecia*

*Interior Systems USA, Inc.,* 2007 WL 627874 (E.D.Mich. Feb. 26, 2007) (citing *Dickenson v.*

*Cardiac & Thoracic Surgery of Eastern Tenn.,* 388 F.3d 976 (6th Cir. 2004) (Plaintiff offered

no justification for its failure to disclose information regarding its calculation of damages and,

---

[8]  This Court previously set a non-expert discovery deadline of July 31, 2007 and
expert discovery deadline of October 31, 2007.  Under Local Rule 37.1(b), a
discovery motion must be filed no later than ten days after the discovery cut-off.

consequently, the court would not permit it to use evidence of damages either at trial or in opposing defendant's motion for summary judgment.  Because it had no evidence of damages, plaintiffs could not prevail on its claims as a matter of law and summary judgment was granted.)  *See also Dorrough v. Tarpy*, 2008 WL 185804 (6th Cir. Jan. 22, 2008) (Because plaintiffs failed to submit their list of expert witnesses pursuant to Rule 26(a)(2), they would likely be barred from introducing testimony of the expert at trial under Rule 37(c)(1) even if plaintiffs were to locate an expert for trial.)  Plaintiffs herein have not attempted to demonstrate that their failure to satisfy Rule 26 was justified or harmless.

Plaintiffs assert that they attached documents to their initial disclosures which specifically identified their lost profits claims and included a letter from Stelco which makes clear that plaintiffs were in danger of losing this client's future business. Plaintiffs, however, do not point to documentation showing computation of damages.  Nor have plaintiffs stated with certainty a number or a formula for calculating lost profits.  The initial disclosures stated:

C.  A computation of damages claimed by disclosing party...

1.  Invoice of damages from Bessemer & Lake Erie Railroad to Seaway Marine Transport dated March 10, 2006, including:

• Exhibit 1- Labor costs

• Exhibit 2- Material costs

• Exhibit 3- Repairs and maintenance costs

• Exhibit 4- Outsourced services

• Exhibit 5- Loss of business

2.  Any future loss of business revenue that may become known through the course of

28

discovery.

(Doc. 40 Ex. C).  Plaintiffs do not submit other documentation evidencing lost profits or calculation of damages for lost revenue.  Plaintiffs' supplementation to its initial disclosures yielded only a document from Union Railroad Company describing the diversion of 12 barges of coal.  (Doc. 33 Ex. 5)  This was, understandably, considered inadequate by defendants given that plaintiffs had claimed  $1,405,776.00 in lost revenue.

Additionally, plaintiffs contend that they responded to nine sets of requests for production of documents and three sets of interrogatories.  Plaintiffs state that these responses were timely although their proofs of service show that their responses to the first and second requests were made only after this Court granted defendants' Motion to Compel responses as to these requests. Again, however, plaintiffs do not point to specific documents supporting their lost profits.

Plaintiffs additionally assert that three of their employees (James Streett, James Rogers and Michael Suter) testified at their depositions regarding the lost profits claims due to train diversions and the loss of the Stelco contract, the calculation of the lost profits, the documents supporting the claims and the reasoning behind the claims.    Suter testified as to calculations.  Defendants' expert, however, explains in his affidavit and expert report why Suter's testimony is inadequate.  (Doc. 33 Exs. 23, 24) Plaintiffs do not offer an expert to support their lost profits claim or to contradict defendants' expert.

Plaintiffs also point out that they voluntarily called an informal discovery meeting to discuss the lost profits claims and the underlying supporting documents which was held on November 30, 2007.  In addition to plaintiffs' representatives, defendants' attorney and

economic expert were present. Plaintiffs present the affidavit of Michael Suter, plaintiffs'

Director of Bulk Material Services, who avers that at the conclusion of the meeting, "it was

agreed that an operating ratio was an effective and an appropriate method of calculating

[plaintiffs'] net lost profit damages."  (Doc. 40 Ex. F)   Defendants' attorney followed up with

a letter dated December 6, 2007 wherein he agreed to recommend this formula to his client

conditioned on other concerns.  The conditions were rejected by plaintiffs. (*Id.* Ex. G)

     In contrast to calculating lost profits considering "avoided costs" or "cost savings" as

explained by defendants' expert, an "operating ratio" may instead be utilized based on

plaintiffs' monthly costs and revenues.  Defendants assert that plaintiffs' attempt to use an

operating ratio (which defendants characterize as the cost of handling cargo versus the

revenue generated) as a basis for calculating lost profits should be rejected by this Court

because plaintiffs have never committed to using this method for calculating damages and

they have not provided a computation of claimed lost profits based upon such an assessment.

For the following reasons, this Court agrees.

     The December 6, 2007 letter states, "[T]he amount of damages that will be considered

'lost profits' for the purpose of trial will be determined by multiplying the total amount of lost

revenue plaintiffs establish through evidence at trial by a factor of 22%."  (Doc. 40 Ex. G)

The gross amount of revenue plaintiffs allegedly lost is $1,315,390.00.  (Doc. 33 Ex. 23) That

figure multiplied by 22% equals a sum of $289,385.00.[9]  Obviously, this figure is greatly less

than the $1.3 million or $1.4 million that plaintiffs previously claimed in lost profits.

---

[9]     Defendants assert that they agreed to accept this formula in exchange for
plaintiffs' withdrawal of lost revenue based on the Stelco contract.  Plaintiffs
rejected the offer.

In responding to defendants' assertion that plaintiffs have not produced evidence of costs saved or avoided with regard to calculating lost profits in the manner proposed by defendants, plaintiffs point to Streett's and Suter's deposition testimony that there were very little or no cost savings as a result of the shutdown of the ship loader.   But, as defendants point out, if plaintiffs could prove that there were no costs saved it would not make sense for plaintiffs to agree to the 22% factor which would reduce their lost profits claim so dramatically. Nevertheless, as defendants point out, plaintiffs have not committed to using the operating ratio as a means of calculating lost profits.  The  December 6 letter expressly stated that the subject of the November 30 meeting was within the protection of Evidence Rule 408 (offers of compromise).  While neither party objects now to the Court's consideration of the contents of that meeting, the parties agreed to recommend the formula to their clients but plaintiffs rejected defendants' conditions.   Nor have plaintiffs shown that they have provided the supporting documentation showing a Rule 26 computation of damages.

Defendants' expert avers

13.  According to information provided by plaintiffs at the July 25 deposition of Michael Suter, the plaintiffs' operating ratio for the years 2004, 2005 and 2006 varied substantially from year to year.  Further, the variances in both revenues and expenses during 2005 *greatly exceed the impact of the damage claimed in this case.*   This indicates significant other factors affected the operating ratio in 2005, and does not assist in qualifying the impact related to the ship loader accident.  A much more detail[ed] approach is required.

14.  As of this time, the plaintiffs have provided insufficient data with which to provide a proper determination of either avoided costs or operating ratio and, as such, the undersigned cannot calculate or express an opinion as to the reasonable assessment of damages sustained by plaintiffs as 'lost profits' except that which is set forth in my ... report.

(Doc. 33 Ex. 24) Plaintiffs have not provided defendants with a position, other than in the

31

informal settlement conference, as to how they would calculate lost profits using an operating ratio.

With regard to the Stelco contract, defendants point out that no reference to this claim was disclosed by plaintiffs until the deposition of Michael Suter on July 25, 2007 - seven months after plaintiffs' initial disclosures and one week prior to the close of non-expert discovery.  At that time, Suter testified that he estimated a $1 million loss in profit in 2006 due to the non-renewal of the Stelco contract.  (Suter depo. 46)

Despite the fact that plaintiffs' initial disclosures were made on December 12, 2006 (i.e., the close of 2006), plaintiffs' only reference to loss of future business is the statement, "Any future loss of business revenue that may become known through the course of discovery."  The Stelco contract was not renewed for the year 2006.  Plaintiffs clearly would have known in December 2006 that they lost business on this basis.   Plaintiffs assert in their brief that they attached a letter to their initial disclosures which "makes clear that plaintiffs were in danger of losing Stelco's future business."  (Doc. 40 at 3) The referenced letter is dated October 27, 2005 and addresses Stelco's need to divert material due to the outage of plaintiffs' ship loader.  (Streett depo. Ex. 7) Considering that Suter testified at deposition that Stelco's non-renewal of the contract in 2006 cost plaintiffs $1 million dollars in profit, plaintiffs should have had documentation in its possession at the close of the year supporting the loss of profits.  (Suter depo. 46)

For these reasons, plaintiffs have failed to comply with Rule 26 as to calculation of, and supporting documents relating to, the claim for lost profits.  As such, the evidence is

excluded and summary judgment is warranted.[10]

Accordingly, defendants' Motion for Partial Summary Judgment as to Damages is granted.

**Conclusion**

For the foregoing reasons, plaintiffs' Motion for Partial Summary Judgment as to Liability is granted and defendants' Motion for Partial Summary Judgment as to Damages is granted.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 5/14/08

---

[10]     Defendants additionally argue that the Court should deny the claim for the post-ship loader repair lost profits incurred in 2006 because they were not reasonably foreseeable.  The Court need not determine this issue.

33