# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **Bessemer & Lake Erie Railroad,** | ) | **CASE NO. 1:06 CV 2392** |
| **Company, et al.** | ) | |
| **Plaintiffs,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Seaway Marine Transport,** | ) | <u>**Memorandum o f Opinion and Order**</u> |
| | ) | |
| **Defendants.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon Plaintiffs' Trial Merit Brief in Support of Recovery of Out-of-Pocket Repair Costs as a Result of the October 4, 2005 Allision (Doc. 78) and Defendants' Trial Merit Brief in Opposition to Plaintiffs' Claim for Damages (Doc. 81). For the following reasons, plaintiffs' request for relief is granted.

<u>**Facts**</u>

This is an admiralty action involving an allision between defendants' vessel and plaintiffs' ship loader on October 4, 2005. This Court previously granted plaintiffs' Motion for Summary Judgment as to liability and defendants' Motion for Partial Summary Judgment as to plaintiffs' damage claim for lost profits. The only remaining issue is plaintiffs' claim for reimbursement of the out-of-pocket damages/repair costs it incurred as a result of the allision. The parties have agreed to submit the matter upon briefs.

Plaintiffs state that their out-of-pocket repair costs resulting from the allision total $522,605.73. These costs are broken down into five general categories:

1

(1) Plaintiffs' Own Employee Labor:

$6,586.00

(2) Plaintiffs' Own Inventory Materials Used in Repairs to Ship Loader No. 1:
$5,507.33

(3) Survey – North American Marine 10/6/2005:

$1,145.94

(4) Emergency Bid Costs – Industrial Maintenance Service, Inc.:

$9,440.08

(5) Amounts Paid to Ryba Marine Company to Repair Ship Loader No. 1:
$499,926.38

Defendants have now agreed to stipulate as to damages in the amount of $425,524.15.

Defendants continue to dispute only the following damages: (1) the emergency bid costs paid

to Industrial Maintenance Service, Inc (IMS) in the amount of $9,440.08; (2) two items paid

to Ryba Marine Company (Ryba): a $41,250.00 charge for a crane and a portion of the flat-

fee charge for mobilization/demobilization. Additionally, defendants do not dispute that

plaintiffs are entitled to prejudgment interest on the amounts awarded to plaintiffs.

**Discussion**

"Full compensation has long been recognized as a basic principle of admiralty law,

where *restitutio in integrum* is the leading maxim applied by admiralty courts to ascertain

damages resulting from a collision." *City of Milwaukee v. Cement Div., Nat.*, 515 U.S. 189

(1995) (citing

*Standard Oil Co. of N.J. v. Southern Pacific Co.*, 268 U.S. 146, 158 (1925) and *The*

*Baltimore,* 75 U.S. (8 Wall.) 377, 385, 19 L.Ed. 463 (1869)). *See also BP Exploration & Oil,*

*Inc. v. Moran Mid-Atlantic Corp.,* 147 F.Supp.2d 333 (D.N.J.,2001) ("The general rule for

recovery of damages due to the negligence of others in admiralty cases is *restitutio in*

*integrum*; the damaged party is entitled to be put in as good a position pecuniarily as he was

in prior to the damage to his property occurring.")

2

Where plaintiff does not suffer a total loss "and repairs are feasible, the cost of repair is the measure of damages."*BP Exploration & Oil, Inc.,* 147 F.Supp2d at 337 (citations omitted).  *See also Admiralty and Maritime Law,* 4th Ed.§ 14-6 Damages (Where the damage to a shore structure or fixed object is repairable, there is liability for reasonable repairs.)

"The emergency response costs incurred by [plaintiffs] are recoverable to the extent that those costs were reasonable. If [defendants contend] the costs were unreasonable, [they] must demonstrate that [plaintiffs'] decision [was] 'palpably' erroneous."  *BP Exploration & Oil, Inc.*147 F.Supp2d at 344 (citing *See Marine Sales & Serv., Inc. v. Greer Steel Co.*, 312 F.Supp. 718, 723 (N.D.W.Va.1970) and  *See Ellerman Lines, Ltd. v. The President Harding*, 288 F.2d 288, 291 (2d Cir.1961)).

### (1) Emergency Bid Costs Paid to IMS in the Amount of $9,440.08

Defendants dispute the reasonableness of the payment by plaintiffs to IMS for its preparation of the proposal to repair the ship loader.[1]  Plaintiffs assert that the IMS bid was reasonable and necessary given the emergency nature of the situation, and plaintiffs' prior experience with IMS's ability to perform the work. Furthermore, the costs were not palpably erroneous given that the structural integrity of the ship loader was at issue and the docks were shut down.

Plaintiffs point to the following testimony.  William Kline, plaintiffs' Chief Engineer, testified that following the allision, there was immediate contact with contractors.  James

---

[1]    IMS's total invoice was $9,245.62, which included $2,050.00 for engineering drawings.  (Rogers depo. 27; Doc. 81 Ex. 8) However, the parties do not dispute that the bid related costs paid to IMS by plaintiffs were in the amount of $9440.08.  (Doc. 78 Ex. A, Ex. 4)

3

Rogers, Manager of Operations at the P&C Dock, was familiar with IMS and so made contact with them.  (Kline depo. 24) Rogers testified that he told IMS that he needed them "right now," within 24 hours, and he agreed that they would be compensated for their expenses. The ship loader was unstable, and plaintiffs were out of business for an unknown period of time. Plaintiffs needed information immediately. IMS informed Rogers that IMS would have to be compensated "up front," and for their travel expenses due to the urgency of the situation. (Rogers depo. 14-18) Ultimately, Ryba's proposal was accepted which was less than IMS's bid, and considered by plaintiffs to be more efficient.  (Kline depo. 40-41)

Defendants contend that this charge is not fair and reasonable, and defendants should not have to reimburse it.  Relying on *United States v. Capital Sand Co.,* 466 F.3d 655 (8th Cir. 2006), defendants contend that IMS's efforts were "not necessary to complete the job." *Capital Sand Co.* states, "Admiralty cases require the [plaintiff] to prove that the amount claimed as damages, including overhead 'is a fair and reasonable charge for the repairs' and 'necessary to complete the job.'" Defendants point to Rogers's deposition testimony that Ryba did not charge plaintiffs for its costs incurred in coming out to evaluate the situation in preparation for doing its bid proposal.  (Rogers depo. 29) Additionally, defendants point out that, to Rogers's knowledge, the work done by IMS was not shared with Ryba for purposes of the latter submitting its estimate. (*Id.* 29-30) Defendants assert that because IMS was not the successful bidder and it did not share its work, its efforts were essentially without value to plaintiffs. Defendants also assert that it is not customary in the industry to compensate a contractor for the privilege of bidding a job.

Plaintiffs assert that *Capital Sand* is inapplicable because it involved, unlike here,

4

recovery of overhead costs which involve general operating expenses.  Even so, that court held the defendant liable for the full amount of the damages.  As discussed in *BP Exploration & Oil, Inc, supra,* plaintiffs are entitled to recover their reasonable emergency response costs unless defendants show that plaintiffs' decision was palpably erroneous.  Defendants have not done so. Plaintiffs have demonstrated the emergency nature of the situation immediately following the allision given the tenuous condition of the ship loader and plaintiffs' inability to conduct business.  IMS was familiar to plaintiffs as a reliable marine contractor.  It is not unreasonable that plaintiffs would consider it necessary to compensate IMS for its immediate response as this was considered necessary under the circumstances.  In fact, James Rogers testified that it is not unusual to pay for such an emergency bid when the situation required a response within 24 hours.  (Rogers depo. 15-16) Nor is it unreasonable or erroneous for plaintiffs to have rejected IMS's bid in favor of Ryba's bid which plaintiffs considered to be more efficient and less expensive. Due to the urgent nature of the situation, it was reasonable for plaintiffs to seek bids that day, and to agree to compensate IMS for accommodating that request.

For these reasons, the Court finds that plaintiffs are entitled to recover the emergency bid costs paid to IMS in the amount of $9,440.08.

### (2) Items Paid to Ryba Marine Company

Ryba's repair costs include two major sub-categories: 1) the actual time and materials charged for the repair work and 2) mobilization and demobilization costs (expenses related to bringing and removing the equipment, materials, and personnel to and from the job site).  With the exception of the charges related to a crane (in the amount of $41,250.00), defendants

5

do not contest the reasonableness of the first sub-category.  Defendants, however, do contest

the second sub-category, although not to the full extent.

A very general overview of the repair process undertaken by Ryba is useful.

Following the allision, plaintiffs contacted Ryba, a marine contractor on the Great Lakes that

has been in operation for around 25 years. Initially, Ryba proposed a repair plan with a bid

submitted on October 10, 2005.  The bid stated that mobilization costs would be $20,000.00.

This initial proposal involved bringing a large barge, that was located on Lake Erie outside of

Cleveland and not far from plaintiffs' docks, to the ship loader and using it as a floating

platform. Upon additional discussions between plaintiffs and Ryba, it was determined that

Ryba would have to build a platform on top of the floating barge in order to reach the ship

loader.  Further consideration made clear that the initial plan was unsafe and impractical due

to Lake Erie conditions. Chet Wallace, Ryba's Senior Vice President, proposed an alternative

plan which involved a jack-up barge system.  This system would provide a stable platform

and would not be affected by weather conditions.  Accordingly, Ryba's second bid was

submitted on October 12, 2005, and incorporated the jack-up barge. The jack-up barge needed

to be disassembled and transported by semi-trucks to plaintiffs' docks.  The second bid

included a $191,000 flat fee for mobilization/demobilization costs.  Plaintiffs accepted this

proposal.

### (a) Crane Charge- $41,250.00

Defendants dispute a $41,250.00 crane rental charge paid by plaintiffs to Ryba.

Defendants assert that Ryba rented the crane for one month for the sum of $17,982.02, but

charged plaintiffs an hourly rate of $125.00 while the job was in process and regardless of

whether the crane was in use.  The hourly rate charges amounted to $41,250.00.  Defendants assert that a fair and reasonable method of charging plaintiffs for the use of the crane would have been on a *per diem* basis, and that the hourly rate resulted in a charge that was more than double that of the rental fee paid by Ryba.  Defendants assert that Ryba had a "windfall,"and defendants should not have to reimburse plaintiffs for it.  For the following reasons, this Court disagrees.

An All Erection & Crane Rental Corp invoice shows that defendants rented an 80 ton crane for one month for a sum of $17,982.02.  (Doc. 74; Chet Wallace depo. 84-85)  Ryba's second proposal indicated that it would be utilizing the crane and plaintiffs would be charged at a rate of $125.00 per hour.  (Doc. 78 Ex. G) Defendants' time and materials invoice to plaintiffs shows that plaintiffs were so charged.  (Doc. 77)

The testimony of Chet Wallace shows that plaintiffs were only charged an hourly fee for the crane rental for those hours that the crane was in use:

> Q: The $125 per hour charge on the crane, I totaled that up and I came up with a number of approximately a little bit over $41,000 in charges for use of the crane on this job, but your cost was only $17,982. Is that something of an extraordinary markup?
>
> A: No. That was -- how do I want to word that. If we used the crane for one hour, that's all they got charged, but we were charged on a daily basis.
>
> Q: Right.
>
> A: If we used it 8 hours, we charged 8 hours or if it was 10. So there's no markup. It was whatever -- I mean, at that point we did not have any idea how much we were going to use it or how long. So it was given on a daily basis -- or an hourly basis.
>
> Q. So you wouldn't consider it to be out of the ordinary to make $41,000 in charges for something that you only rented out at $17,000?
>
> A Again, you are critiquing it after the fact. At the other end, if we didn't use it that

much, we would have went the other way. You are looking at it -- do I think it's unreasonable? No, I do not, because we had the risk on the other end too.

(Wallace depo. 88-89) Wallace's testimony shows that defendants rented the crane for a specified amount, and charged plaintiffs for the time that it was used.  This was quoted in their proposal which was accepted by plaintiffs. Wallace's testimony also shows that had defendants not used the crane as much, defendants would not have recouped their rental fee.

William Kline's testimony concurs with Wallace's testimony and shows that the rate charged was reasonable:

Q: Mr. Kline, in your experience, was the hundred twenty-five dollar hour rate for the crane, hundred-ton crane rental, was that fair and reasonable?

A: Yes.

Q: Based on your experience?

A: Past experience.

Q: Okay. And, in fact, you were not charged 12 hours per day at that $125 per hour rate, were you, per Exhibit 7?
***
Q: And to pick up on what Mr. Miles said, you were just charged for the actual hours of use of the hundred-ton crane, right, not a flat rate of 12 hours per day?

A: Correct.

(Kline depo. 94-95)

As discussed above, plaintiffs are entitled to be put in as good a position pecuniarily as before the allision, and "the cost of repair is the measure of damages."  *BP Exploration & Oil, Inc., supra.*  Plaintiffs incurred this out-of-pocket expense as part of the payments to Ryba. On this basis, plaintiffs are entitled to reimbursement of this charge as part of the cost of the repairs.

8

**(b) mobilization and demobilization costs**

Defendants challenge the reasonableness of the $191,000.00 flat mobilization/demobilization fee paid to Ryba.  Defendants point out that Ryba's first proposal to plaintiffs included a fixed fee for mobilization in the amount of $20,000.00.  (Doc. 78 Ex. F) The second proposal, two days later, included the fixed fee for mobilization and demobilization in the amount of $191,000.00.  (Doc. 78 Ex. G) Defendants assert that this dramatic increase "went virtually unquestioned by plaintiffs," and resulted in a windfall for Ryba. (Doc. 81 at 3) Defendants contend that, based upon documentation, the actual cost of mobilization and demobilization incurred by Ryba totaled only $122,131.00.  As such, defendants assert that they should not have to reimburse the difference of $68,869.00, which constitutes a windfall to Ryba.  For the following reasons, this Court disagrees.

Defendants assert that they only received a copy of Ryba's second proposal through discovery in July 2007. At that time, defendants deposed Michael Suter, plaintiffs' corporate representative, who testified that the jack-up barge system caused the cost of the mobilization to increase so dramatically, but that plaintiffs did not ask Ryba for an itemization of the $191,000.00 mobilization fee or question them as to what went into that charge.  At William Kline's original deposition, taken in May 2007, he was asked to compare the estimated cost of the original bid with the ultimate cost of the repair and he could not give a reason for the increased charge.  In Kline's second deposition, taken in August 2008, he was asked about the increased mobilization charge from the first to the second Ryba proposal, and understood it to be based on the jack-up barge system.  Because he was not familiar with the workings of the jack-up barge, he had to take Ryba's word that the charge was reasonable.

9

The Court agrees with plaintiffs that defendants have improperly attempted to hold plaintiffs to only that portion of their out-of-pocket costs which Ryba has specifically documented as costs. Rather, as plaintiffs contend, the purpose of a flat fee/lump sum bid is to estimate the potential costs of a particular line item and to allow the parties to agree to that fee before it has been incurred. Defendants do not cite to a legal basis for their assertion that the entire flat fee bid must be supported by documentary evidence. Plaintiffs convincingly assert that they are not legally required to prove to defendants, in hindsight, that each and every cent of the $191,000 flat fee bid of a third-party contractor was spent on the mobilization/demobilization.

The testimony of Ryba's Chet Wallace shows that Ryba incurred the risk in formulating the flat fee bid amount because Ryba's actual incurred costs could have been more than the estimated fee.  (Wallace depo. 10-11)  Plaintiffs, on the other hand, were assured of the amount the mobilization/demobilization would cost.  Wallace also testified that the standard custom and practice in marine contracting is that mobilization and demobilization costs are done on a flat rate, fixed priced basis.  (*Id.* 6) Likewise, plaintiffs' William Kline testified that mobilization/demobilization costs are a regular part of marine repair bids.  (Kline depo. 67)

Additionally, defendants have not demonstrated that plaintiffs' representatives failed to question the second bid's increased mobilization fee and blindly accepted it.  Defendants assert that William Kline's credibility is questionable given that he only provided a detailed explanation in his second deposition when asked about the increased mobilization cost in the second bid.   At his first deposition, however, Kline was not questioned about the second

10

Ryba bid, but was asked to explain the discrepancy between the estimated cost of the original

bid with the ultimate cost of the repair.  At his second deposition, he was specifically asked

about the increased mobilization cost from the first to the second bid.  Kline responded that he

understood that it was "a much bigger number than the initial proposal," but that it was "quite

understandable" given that "we were talking about a totally different animal at this point."

(Kline depo. 37-38) In particular, while the original proposal would involve bringing a barge

through the water from a nearby location, the second proposal required transporting the jack-

up barge, in pieces, via semi-trucks over the land at an additional cost.  (*Id.* 38-39) Indeed,

Chet Wallace testified as to the enormity of the task.  (Doc. 78 Ex. E) Defendants do not cite

to evidence showing that the $191,000.00 flat fee was unreasonable for the work performed,

but point out that the mobilization/demobilization costs increased significantly from the first

to the second bid. Kline's deposition testimony, however, demonstrates that the second bid

involved a completely different method of performing the work:

> Q: Okay. Earlier you testified that when you received the [second] proposal where the mobilization and demobilization costs went from 20,000 to 191,000, that you had had a discussion with Tom Morrish of Ryba Marine regarding what those charges included. Is that correct?
>
> A: That's correct.
>
> Q: I would like to ask you a few things about that, but let me start off with what your understanding is of the definition of the mobilization charges, when do they begin and when do the mobilization charges that were part of the flat fee, where did those stop.
>
> A: Okay.
>
> Q: What was your understanding based on that discussion you had?
>
> A: Well, my understanding is not based solely on a discussion that I had with Tom Morrish for this job but it has to do with my years of experience with dealing with contractors and projects that require mobilization and demobilization costs; that those

11

mobilization and demobilization costs are incurred by the vendor prior to showing up on the property and after they leave to get back to a certain point where they started.

\*\*\*

Q: Now, you said that Mr. Morrish did a good job of explaining to you why the charge went from 20,000 to 191,000. What is it that he told you that you felt was an adequate explanation?

A: That he was going to use a  piece of equipment, that instead of being, you know, 14 miles away in Ashtabula, I think is where -- he said it was in Lake Erie and for some reason I'm thinking it was in Ashtabula doing work, which is roughly 14 miles from Conneaut. Okay? To get a barge from Ashtabula to Conneaut versus getting a barge from
someplace over in Lake Michigan. As I recall, that was where the jack-up barge was, it was someplace over in Lake Michigan. And now, you know, he's telling me he's going to have to bring trucks in. So truck's [sic] got to have a driver, there's a cost for a truck, there's a number of trucks, things are going to start adding up that I felt were reasonable.

(Kline depo. 66-70).

As stated above, plaintiffs accepted the second proposal as safer and more efficient, although more expensive than the first for the mobilization/demobilization. Plaintiffs assert that they paid the $191,000 mobilization/demobilization out-of-pocket cost because they needed their docks back in working order and Ryba's bid was the safest most cost-efficient means to that end.  The Court finds that defendants have not shown this to be unreasonable.

Plaintiffs are entitled to reimbursement of their out-of-pocket costs.  This includes the entire $191,000.00 flat fee sum paid to Ryba for mobilization/demobilization.

**(3) Prejudgment Interest**

The parties agree that plaintiffs are entitled to pre-judgment interest, and that United States Treasury Bills are an appropriate measure of calculation.  The parties, disagree, however, regarding the date from which pre-judgment interest should run.  Plaintiffs assert

12

that such interest should commence from the date of the allision on October 4, 2005. Defendants submit that this interest should run as of the date plaintiffs filed their Complaint on October 3, 2006.  The Court agrees with plaintiffs. *See Caravel/Woodwind Charters, Inc. v. Tahoe*, 2008 WL 109093 (E.D.Cal. 2008) (citations omitted) ("Generally, prejudgment interest is awarded from the date of the collision in order to compensate the plaintiff in full."); *Zerega Avenue Realty Corp. v. Hornbeck,* 2007 WL 3125318 (S.D.N.Y. 2007) ("Prejudgment interest should be calculated based upon the average interest paid on six-month United States Treasury Bills, from the date of the allision... until the date the judgment is entered in this action."); *Gross Ild Bridge Co. v. American S.S. Co.,* 2006 WL 680855 (E.D.MIch 2006) (citing *City of Milwaukee v. Cement Division, Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995) ("Prejudgment interest on a monetary award for an admiralty tort is calculated from the allision date to the judgment date.")

### Conclusion

For the foregoing reasons, plaintiffs are entitled to recover $522,605.73 plus pre-judgment interest from the date of the allision through the entry of judgment.

IT IS SO ORDERED.

/s/Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Date:   11/24/08

13